AO 106 (Rev. 04/010) Application for Search Warrant   AUTHORIZED AND APPROVED/DATE: Daniel D. Gridley, Jr. 11/03/2022

# UNITED STATES DISTRICT COURT
for the
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be search<br>Or identify the person by name and address)*<br><br>PROPERTY KNOWN AS:<br>    Red Apple iPhone;<br><br>IN THE POSSESSION OF:<br>    DEA Oklahoma City District Office<br>    901 NE 122nd Street<br>    Oklahoma City, Oklahoma 73114 | Case No: MJ-22-798-STE |

## APPLICATION FOR SEARCH WARRANT

I, a federal law enforcement officer or attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property *(identify the person or describe property to be searched and give its location)*:

See Attachment A, which is attached and incorporated by reference.

Located in the Western District of Oklahoma, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is attached and incorporated by reference.

The basis for the search under Fed. R. Crim.P.41(c) is *(check one or more)*:
- ☒ evidence of the crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841 | Possession of Fentanyl with Intent to Distribute |
| 21 U.S.C. § 846 | Drug Conspiracy |

The application is based on these facts:

See attached Affidavit of Task Force Officer Curtis Diel, Jr., Drug Enforcement Administration, which is incorporated by reference herein.

- ☒ Continued on the attached sheet(s).
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet(s).

*Applicant's signature*

CURTIS DIEL, JR.
Task Force Officer
Drug Enforcement Administration

Sworn to before me and signed in my presence.

Date: __**Nov 3, 2022**__

City and State: Oklahoma City, Oklahoma

*Judge's signature*

SHON T. ERWIN, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF A CELLULAR TELEPHONE: RED APPLE IPHONE, SEIZED FROM HORACIO MARTINEZ-AGUILAR** | Case No. M-22-798-STE<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Drug Enforcement Administration (DEA) Task Force Officer Curtis Diel, Jr., being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— electronic devices, as further described in Attachment A hereto—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Task Force Officer (TFO) of the DEA. As such, I am "an investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, and to

make arrests for, the offenses enumerated in Title 18, United States Code, Section 2516. I have been a TFO with DEA since June 2022. I have been an Agent with the Oklahoma Attorney General's Office since January 2004. I have worked numerous complex, multi-jurisdictional investigations. I am well versed in a multitude of investigative methods, including working confidential sources, interviews, arrests, search warrants, seizure warrants, and analyzing cellular phone data.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, reports provided to me by other law enforcement officers, and statements made by witnesses and other concerned parties. Since this Affidavit is being submitted for the limited purpose of establishing probable cause for the requested warrant, I have not included each and every fact known to me concerning this investigation.

4. The property to be searched is a Red Apple iPhone in a black case with monogrammed initials, "HM" (hereinafter, the **Target Cell Phone**), seized from Horacio MARTINEZ-AGUILAR (MARTINEZ-AGUILAR). The **Target Cell Phone** is currently located in secure evidence storage at the DEA Oklahoma City District Office.

5. Based on the facts set forth in this Affidavit, there is probable cause to believe that violations of 21 U.S.C. § 841 and 846 have been committed by MARTINEZ-AGUILAR, and other known and unknown co-conspirators.

The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

6. I submit this affidavit in support of an application for a search warrant for the **Target Cell Phone**. An investigation has revealed that the **Target Cell Phone** is associated with a Drug Trafficking Organization (DTO) transporting large quantities of Fentanyl and Methamphetamine through the Western District of Oklahoma.

7. On September 8, 2022, Oklahoma Highway Patrol (OHP) Trooper Michael Eckhardt (Eckhardt) was working stationary patrol on Interstate 40 (eastbound) in Caddo County Oklahoma. Eckhardt observed a semi-truck/tractor trailer approaching on the outside (right) lane. Directly behind the semi was a small gray car. As the semi and car passed his location, Eckhardt could see the small gray car was following too closely in violation of Oklahoma Statute Title 47 section 11-310(a), which states "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." There was no other

immediate traffic that would keep the gray car from changing lanes and effecting a pass in the left lane or to slow and create more space.

8. Eckhardt pulled onto the roadway to catch up to the gray car and initiate a traffic stop. As Eckhardt got closer to the vehicle, he could see the gray car was slowing dramatically upon his approaching marked Oklahoma Highway Patrol car. Eckhardt was able to get in behind the violator's vehicle and initiated his emergency lights signaling the vehicle to pull to the shoulder and stop. The vehicle took longer than most vehicles to pull to the shoulder and stop. The gray car was a 2016 Nissan Sentra bearing Arizona license plate KCA5PJ, registered to Abraham LOPEZ. It came to a stop at the 94 mile marker in Caddo County, Oklahoma.

9. Eckhardt made a passenger side approach to the vehicle and asked the driver, for his license. Eckhardt could smell the strong odor of air freshener coming from within the vehicle. The driver's hands were shaking, and he was able to produce a Sonora, Mexico driver's license. Eckhardt asked the driver back to his patrol car for enforcement action.

10. Inside his patrol car, Eckhardt told the driver, MARTINEZ-AGUILAR, that he would be getting a warning that would not cost money and would require no further action. This almost always puts the driver at ease knowing what enforcement action will be taken.

11. During the course of the law enforcement checks, Eckhardt inquired about

MARTINEZ-AGUILAR's travel plans. MARTINEZ-AGUILAR advised he was going to Oklahoma City "just for the weekend and go some places." When Eckhardt asked what he was going to do he said just to hang out and go to new places. MARTINEZ-AGUILAR appeared very uncomfortable and tense. Eckhardt asked about who owned the vehicle and he said "Abraham" as if he had to think about it or was questioning his answer. When asked about where they were coming from, MARTINEZ-AGUILAR said Tucson [AZ] and he lives in Sonora, Mexico. Eckhardt asked him about his passport because driving on a foreign driver's license in Oklahoma requires a passport or other supporting document. When asked where that document was, he said it was in the glove box. Eckhardt asked MARTINEZ-AGUILAR why Oklahoma City of all places and he said to go to the restaurants and nightclubs. Eckhardt asked him why not Dallas or Los Angeles and he said because his cousin invited him. When doing this, Eckhardt noticed he was grooming his face and still seemed very uncomfortable and stressed.

12. Eckhardt went up to the Nissan to retrieve MARTINEZ-AGUILAR's passport or visa to ensure driving on his Mexico license was in compliance with Oklahoma law, to retrieve the insurance, and to verify ownership of the vehicle. Eckhardt spoke with the passenger and only other occupant of the vehicle, Abraham LOPEZ (LOPEZ), who was laying back like he was pretending to be asleep. While LOPEZ was getting the requested

5

documents, Eckhardt asked about their travel and LOPEZ indicated they were going to Milwaukee, Wisconsin to see the Brewers play baseball and stay for a couple days. The passenger identified himself with a Texas driver's license bearing the name Abraham LOPEZ. When speaking with LOPEZ, Eckhardt could see his heart carotid artery pounding and he was sweating inside a climate-controlled vehicle. There was no passport present as MARTINEZ-AGUILAR stated.

13. Eckhardt went back to his patrol car, completed the warning and issued it to MARTINEZ-AGUILAR while handing him back all of his documents. Eckhardt reiterated the reason for the stop, wished him a safe trip and shook his hand. In doing so MARTINEZ-AGUILAR had a very sweaty hand. During the entire course of the stop, MARTINEZ-AGUILAR remained very tense, leaning forward in the Trooper's passenger seat, grooming himself when answering questions and was seemed unsure of his answers. MARTINEZ-AGUILAR began to exit Trooper Eckhardt's patrol car. Believing MARTINEZ-AGUILAR and LOPEZ were involved in criminal activity, Eckhardt asked MARTINEZ-AGUILAR if he could ask him some more questions and he agreed.

14. Eckhardt asked MARTINEZ-AGUILAR several questions to confirm MARTINEZ-AGUILAR's final intended destination was Oklahoma City. MARTINEZ-AGUILAR confirmed he was just going to Oklahoma City with

his cousin, LOPEZ, to go to the nightclubs, see things and enjoy the really good food. When Eckhardt asked specifically why Oklahoma City, MARTINEZ-AGUILAR talked in circles and could not really explain why Oklahoma City was the destination as if he were being deceptive. The stated travel plan seemed suspicious to Eckhardt.

15. Eckhardt went back to LOPEZ, the passenger and registered owner of the vehicle, and explained to him the reason for traffic stop was completed and MARTINEZ-AGUILAR had all of the documents. Eckhardt asked LOPEZ more about the trip and he stated he knew the shortstop for the Milwaukee Brewers baseball team. MARTINEZ-AGUILAR further advised he was going to watch a home game in Milwaukee, Wisconsin. Eckhardt asked him if he had anything in his car that he should not have. LOPEZ said he did not. Eckhardt asked specifically about guns, alcohol, marijuana, methamphetamine, cocaine and heroin. LOPEZ got choked up when answering about cocaine versus the other drugs. In speaking with LOPEZ, he was still sweaty looking, appeared stressed, and his heart was racing.

16. Eckhardt asked LOPEZ if he could search his vehicle, and he said "yes, sure" with an affirmative tone. Eckhardt brought LOPEZ back to his patrol car and had him sit inside. Eckhardt advised him if he needed anything during the search to have MARTINEZ-AGUILAR honk the horn and he would come back to them giving them a clear way to get his attention if they so

7

choose to revoke consent to search the vehicle. LOPEZ told Eckhardt to take his time. Eckhardt asked MARTINEZ-AGUILAR for permission to search his bag which he claimed was located in the trunk, and he agreed.

17. Eckhardt conducted a search of the vehicle and noticed a single Christmas tree air freshener on the passenger side dash by the front glass and a new air freshener in the center vents. There was also a used roll of black gorilla tape along with a receipt for 2 rolls of gorilla glue brand duct tape purchased September 7, 2022, in Tucson Arizona. During the search, Eckhardt located an aftermarket false compartment inside the passenger side of the dash. This setup is commonly used to traffic illegal drugs. Eckhardt asked LOPEZ how to get into the compartment and he first denied knowing what Eckhardt was talking about.

18. Eckhardt had LOPEZ read the Miranda warning in Spanish and made sure he understood. Eckhardt told him, he knew there were drugs in the compartment and he told Trooper Eckhardt there was cocaine in the compartment and eventually showed him the sequence to open the electronically controlled compartment.

19. To access the compartment, LOPEZ started the car, removed the center cup holders and trim to access the area under the parking brake assembly, pressed a hidden button, and pressed a trunk release on an aftermarket key fob that was located in the glove box. When he did this, the center vents

8

popped loose and had been held in place by a trunk latch and metal rod modified to hold the vents in place. The vents were pulled the rest of the way out giving access to the box under the dash. The center duct work had been modified and was held in place using magnets.

20. Eckhardt found eight kilogram sized bricks packaged in vacuum sealed food saver bags in the compartment. This substance in the bricks field tested positive for both cocaine and fentanyl. The compartment also contained a zip lock bag of approximately 1 kilogram of crystal substance now known to be methamphetamine. The inside of the compartment was lined in lead which is utilized in attempt to thwart x-ray machines.

21. DEA agents were contacted and both suspects, the vehicle, and evidence were transported to Oklahoma City, Oklahoma. Evidence and suspects were released to Task Force Officer (TFO) Curtis Diel, TFO Jim Peek, Special Agent (SA) Robin Melodick, and SA Brook Wilson.

22. On September 9, 2022, at approximately 12:45pm, TFO Curtis Diel, along with additional agents/officers from the DEA Oklahoma City District Office, arrived at the OHP office to conduct interviews with LOPEZ and MARTINEZ-AGUILAR. SA Wilson read LOPEZ his Miranda rights via a DEA-13A form in Spanish and LOPEZ stated that he understood his rights and agreed to answer questions. However, agents were able to communicate well with LOPEZ in English.  LOPEZ stated that he knew there was illegal

drugs within the vehicle, and that he was aware that the illegal drugs were hidden in the dashboard. LOPEZ stated that he had made multiple trips with illegal drugs previously. LOPEZ stated that he was to be paid $6,000.00 for making the trip and that he was going to give his cousin, MARTINEZ-AGUILAR $200 for accompanying him on the trip. LOPEZ stated that MARTINEZ-AGUILAR knew that the vehicle contained illegal drugs and that the purpose of the trip was to deliver the illegal drugs

23. MARTINEZ-AGUILAR positively identified the Target Cell Phone as belonging to him.

24. MARTINEZ-AGUILAR requested the presence of an attorney and all questioning of MARTINEZ-AGUILAR ceased.

25. Both MARTINEZ-AGUILAR and LOPEZ were transported to the Logan County Jail in Guthrie, OK.

26. On September 8, 2022, TFO Curtis Diel and Robin Melodick took possession of the illegal drugs, cellular phones belonging to MARTINEZ-AGUILAR and LOPEZ, as well as other items of evidentiary value, from OHP, at 3600 North Martin Luther King Jr. Blvd, Oklahoma City, OK, and transported them to the DEA Oklahoma City District Office (OCDO).  Upon arrival at the OCDO the cellular telephones belonging to MARTINEZ-AGUILAR and LOPEZ, as well as the other non-drug items of evidentiary value, were placed in secure temporary storage pending processing.

27. The methamphetamine weighed approximately 1,034.2 grams and the fentanyl / cocaine mixture weighed approximately 10,882.5 grams.

28. On September 9, 2022, I completed a federal complaint affidavit for LOPEZ and MARTINEZ-AGUILAR for the charges of Possession of Methamphetamine and Fentanyl with Intent to Distribute and arrest warrants were signed by the Honorable Gary M. Purcell, Magistrate Judge for the Western District of Oklahoma.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

29. Based on the foregoing, I know that MARTINEZ-AGUILAR and LOPEZ were in possession of a large quantity of methamphetamine and fentanyl within the Western District of Oklahoma. Moreover, the **Target Cell Phone** was in the vehicle with MARTINEZ-AGUILAR to which he positively identified as belonging to him. Therefore, I submit there is probable cause to believe the **Target Cell Phone** would lead to evidence furthering the investigation of the DTO in the Western District of Oklahoma and other locations.

30. The **Target Cell Phone** is currently located in secure evidence storage at the DEA OCDO. In my training and experience, I know that the **Target Cell Phone** has been stored in a manner in which its contents are (to the extent material to this investigation) in substantially the same state as it was when the **Target Cell Phone** first came into the possession of DEA

Oklahoma City.

31. Based on my training, experience, and research, I know that the **Target Cell Phone** has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

32. From my training and experience, I know that drug smuggling is often a conspiratorial crime. Individuals who possess controlled substances with the intent to deliver them typically do so in groups with the assistance of others. Drug traffickers often use their cell phones to communicate with other members of the drug trafficking organization. Records of these communications and the contact information of the smugglers are often saved in the individual's phone.

33. An examination can reveal the approximate location of the **Target Cell Phone** and the user by associating a specific date and time with: historical GPS data, historical cell-site data, and logs of Wi-Fi networks. Additionally, an examination can reveal the **Target Cell Phone** unique identifiers (phone number, IMEI, IMSI, etc.). These unique identifiers can be used to compel material records from the cell phone service provider such as call logs, billing information, and historical cell-site data, which could be used

to further investigate the DTO.

34. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

35. There is probable cause to believe that things that were once stored on the **Target Cell Phone** may still be stored there, for at least the following reasons:

    a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium

13

       that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

36. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Target Cell Phone** was used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Target Cell Phone** because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

      c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

      d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

37. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the requested warrant would permit the examination of the **Target Cell Phone** which

15

may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **Target Cell Phone** to human inspection in order to determine whether it contains evidence described by the warrant.

38. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is probable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

39. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Target Cell Phone** described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

_____
Curtis Diel Jr.
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me on **Nov 3, 2022**

_____
United States Magistrate Judge
Western District of Oklahoma

16

## ATTACHMENT A

The property to be searched are described as: **A RED APPLE IPHONE CELL PHONE, SEIZED FROM HORACIO MARTINEZ-AGUILAR**; hereinafter the "Target Cell Phone". The Target Cell Phone is currently located in secure evidence storage at DEA Oklahoma City, located at 901 NE 122nd Street, Oklahoma City, Oklahoma. This warrant authorizes the forensic examination of the Target Cell Phone for the purpose of identifying the electronically stored information described in Attachment B.

    a.  **a Red Apple IPhone Cell Phone**



## ATTACHMENT B

1. All records on the Target Cell Phone described in Attachment A that relate to violations of 21 U.S.C. § 846 involving Horacio MARTINEZ-AGUILAR, including:

    a. lists of customers and related identifying information;

    b. types, amounts, and prices of drugs smuggled as well as dates, places, and amounts of specific transactions;

    c. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    d. all bank records, checks, credit card bills, account information, and other financial records.

2. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

    a. records of Internet Protocol addresses used;

    b. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.